UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:

                                                 Chapter 7

Lemar Larsen
*aka* Lemar Howard Larsen,                       Case No. 1-16-42589-nhl

                         Debtor.
----------------------------------------------------------------x
Patricia Larsen,
                         Plaintiff,

-against-                                Adv. Pro. No. 1-16-01116-nhl

Lemar Larsen,

                         Defendant.
----------------------------------------------------------------x

## DECISION AFTER TRIAL

Appearances:

| | |
|---|---|
| Michael D. Siegel | Michael F. Kanzer |
| Siegel & Siegel PC | Michael F Kanzer & Associates PC |
| One Penn Plaza | 2214 Kimball Street |
| Suite 2414 | Basement Level |
| New York, NY 10119 | Brooklyn, NY 11234 |
| *Attorney for Plaintiff* | *Attorney for Defendant* |

NANCY HERSHEY LORD
UNITED STATES BANKRUPTCY JUDGE

Before the Court is an adversary proceeding commenced by plaintiff Patricia Larsen ("Patricia") seeking a determination that her pre-petition judgment in the amount of $36,257.20 against her nephew, Lemar Larsen, the debtor and defendant herein (the "Debtor"), is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).[1] Patricia's judgment is based on an unpaid claim for funeral expenses against the estate of Howard Larsen, of which the Debtor served as administrator. She alleges here that the Debtor's knowing failure to pay the claim despite the availability of estate assets constituted defalcation, and that the resulting debt is therefore exempt from discharge under the Code.

The Court held a trial on this matter after denying Patricia's motion for summary judgment. As explained fully below, the Court finds that Patricia has failed to establish by a preponderance of the evidence that the debt arose from the Debtor's defalcation while acting in a fiduciary capacity. Consequently, the Debtor's liability to Patricia falls within his discharge.

## Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and 157(b)(1), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (I). The following are the Court's findings of fact and conclusions of law to the extent required by Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## Relevant Procedural History

On June 28, 2016, Patricia commenced the instant adversary proceeding by filing a complaint seeking relief under § 523(a)(4). Compl., ECF No. 1. After the Debtor filed his

---

[1] 11 U.S.C. §§ 101 *et seq.* may be referred to throughout as the "Code." References to "§ ___" are to sections in the Code unless otherwise specified.

amended answer, Am. Answer, ECF No. 11, the Court entered a pre-trial scheduling order, Sched. Order, ECF No. 13. Prior to the deadline set by that order for dispositive motions, Patricia filed a motion for summary judgment. Summ. J. Mot., ECF No. 18. There, Patricia asserted that the Debtor was collaterally estopped from defending against this nondischargeability action in light of a Surrogate's Court decision, later reduced to a judgment by the New York County Civil Court, that directed the Debtor to pay Patricia the amount of her claim against the decedent's estate. *Id.* Patricia argued that because the decision found that the Debtor was a fiduciary by virtue of his status as administrator, and that he failed to pay a valid claim, there was no issue left for trial. *See id.*

The Court denied Patricia's summary judgment motion at a hearing held on May 2, 2017. *See* Order Denying Mot., ECF No. 24. At that hearing, the Court explained that the Surrogate's Court's decision made no finding with respect to, nor even made mention of, the Debtor's state of mind in failing to pay the claim, and that therefore the decision alone did not entitle Patricia to summary judgment in this action. *See Ke v. Wang*, 628 Fed. App'x 10, 12 (2d Cir. 2015). This Court made no further findings at that time.

The matter proceeded to trial, which was held over the course of a single day. *See* July 14 Tr., ECF No. 31. The parties stipulated that all exhibits would be admitted into evidence. *Id.* at 13:10–12. Patricia's case in chief consisted solely of her own testimony. *See id.* at 14–38. The Debtor's case was comprised of his own testimony, as well as that of Howard Larsen's step-daughter, Renee Harris, and the Debtor's ex-girlfriend, Ronniesha Thomas. *See id.* at 38–79. The parties submitted post-trial briefs in lieu of closing argument, *see id.* at 80; ECF Nos. 27–30, and the matter was subsequently marked submitted.

**Facts**

Howard Larsen, the Debtor's father and Patricia's brother, died intestate on May 8, 2006. Pl.'s Ex. A; July 14 Tr. 62, ECF No. 31. According to the Debtor's testimony, on that same day, Patricia began making funeral and burial arrangements. *See* July 14 Tr. 38, ECF No. 31. By May 10, 2006, she had purchased two spaces in a crypt in Woodlawn Cemetery—one for her brother, Howard, and the other for her and Howard's mother, Beulah Larsen. *See* Def.'s Ex. A; July 14 Tr. 17, 23, ECF No. 31. The price of the two spaces totaled $18,485. Def.'s Ex. A. Patricia also paid $8,559.10 to Benta's Funeral Home for Howard's funeral expenses. *See* Pl.'s Ex. B.

In the days following Howard's death, the Debtor and Patricia had at least two conversations about how his funeral and burial would be handled and paid for. *See* July 14 Tr. 38–42, ECF No. 31. The first, on May 10, 2006, the same day that Patricia bought the two crypt spaces, occurred over a car speakerphone while the Debtor and his then-girlfriend, Thomas, were driving between Connecticut, where the Debtor lived at the time, and New York, the location of a co-op that his father owned. *See* July 14 Tr. 39, 52, 76–77, ECF No. 31. According to the Debtor, during this conversation he expressed an intent to have his father cremated; Patricia, on the other hand, advocated for the use of the crypt space. *See id.* at 42–43, 45. The second conversation occurred the next day when the Debtor and Harris, his step-sister, met Patricia at the funeral home. *See id.* at 41. The Debtor left each of these conversations under the impression that Patricia would be paying for "everything," and that she did not want to be reimbursed. *See id.* at 41–42. Thomas, who overheard the first conversation in the car, testified that she was left with a similar impression.[2] *See id.* at 77.

---

[2] Thomas stated of the conversation, "They were speaking about the funeral arrangements. He [the Debtor] was telling her that he had everything covered of how his father wanted to be buried and she said that he didn't have to worry about it because she was going to take care of everything. So I took that to mean she was going to pay for everything." July 14 Tr. 77:12–18.

On May 18, 2006, the Debtor executed and filed a petition for letters of administration of his father's estate. Pl.'s Ex. A; *see* July 14 Tr. 50. On the petition, the Debtor's address appears as 62 Haddad Road, Waterbury, Connecticut. Pl.'s Ex. A, at 2. On the final page, just above the Debtor's signature, is an "Oath of Administrator," which reads,

> I am over eighteen (18) years of age and ***A CITIZEN OF THE UNITED STATES***; and I will well, faithfully and honestly discharge the duties of Administrator of the goods, chattels and credits of said decedent according to law. I am not ineligible to receive letters and will duly account for all moneys and other property that will come into my hands.

*Id.* at 6 (emphasis in original). The Debtor is not an attorney, and was not represented in any matter before the Surrogate's Court. *See id.* at 60. When asked about this petition, the Debtor explained that he did not fully understand "what Surrogate Court was," and that he did not read the forms, but simply followed the instructions provided by the Surrogate's Court clerk. July 14 Tr. 51, 60. The Surrogate's Court granted the petition on May 25, 2006. *Id.* at 1.

On June 16, 2006, Patricia executed a verified claim (the "Claim") against the decedent's estate in the amount of $27,697.10, for, as the Claim read, "[p]ayment of funeral, burial costs, church fees, acknowledgement cards and stamps. His Mom's money for bills. (Beulah Larsen)." Pl.'s Ex. C. The Claim was sent to the Debtor by certified mail on the same date, and, according to a delivery receipt, received by the Debtor on June 20, 2006. *See id.* The Debtor testified that he had not seen the Claim, and that the signature on the delivery receipt was not his. *See* July 14 Tr. 51, ECF No. 31.

The Debtor did not pay the Claim in the months that followed. However, on or around January 22, 2007, he executed and filed with the Surrogate's Court a petition to amend the letters of administration. *See* Pl.'s Ex. D. The petition to amend, on which the Debtor again listed his address as 62 Haddad Road in Connecticut, reflects an increased valuation of Howard's co-op.

*Id.* Around this time, though exactly when was never disclosed, the Debtor sold the co-op and placed the sale proceeds into a bank account that he opened for the estate. *See* July 14 Tr. 18–19, 48–49, ECF No. 31.

Around May of 2007, Patricia filed an application with the Surrogate's Court to compel the account of Howard's estate. *See* Pl.'s Ex. D; Pl.'s Ex. E. The application was granted at a hearing on May 1, 2007, and on May 22, 2007, the Surrogate's Court issued an order directing the Debtor to file an "account of his proceedings as administrator of said estate, together with a petition for its judicial settlement." Pl.'s Ex. D. The Debtor never filed an accounting, and claimed that he was unaware that he was required to do so. *See* July 14 Tr. 59–60, ECF No. 31.

On or around May 29, 2007, the Debtor wrote a letter to Stuart Salles, Patricia's lawyer at the time, offering to pay $18,145 to Patricia as reimbursement for funeral and burial costs. *See* Pl.'s Ex. C; Def.'s Ex. B. The letter contests having to reimburse the cost of a crypt space for Patricia's mother, noting that repayment for that expense "was never discussed." Pl.'s Ex. C; Def.'s Ex. B. The letter also accuses Patricia of taking $5,000 in traveler's checks from Howard's co-op. *See* Pl.'s Ex. C; Def.'s Ex. B. The Debtor testified that he wrote this letter in response to one from Salles requesting reimbursement. *See* July 14 Tr. 45, ECF No. 31.

One month after writing this letter, the Debtor moved from 62 Haddad Road to 383 Bunker Hill Avenue in Connecticut. *See id.* at 53–54. He purchased the Bunker Hill property with "money from [his] father's estate," and lived there for approximately the next two years. *Id.* at 54–55. The Debtor never informed the Surrogate's Court of his move, and claimed that he was unaware that this was required of him. *Id.* at 59.

On or about October 16, 2008, a year after the Debtor's letter, Patricia sent a letter in response. *See* Pl.'s Ex. C. It provides an alternate breakdown of her expenses that excludes the

crypt space for her mother, Beulah, and totals $19,204. *Id.* The letter is addressed to the Debtor at 62 Haddad Road, *id.*, though at the time it was sent the Debtor had already moved to Bunker Hill Avenue, *see* July 14 Tr. 54–55. The Debtor testified that he had never seen the letter. July 14 Tr. 46, ECF No. 31.

In or around 2009, the Debtor moved from the Bunker Hill address to an apartment at 1645 Grand Concourse, Bronx, New York. *Id.* at 47. The Surrogate's Court was not informed of this move either. *See id.* at 59. While the Debtor still owns the Bunker Hill property, it is currently occupied by a "friend." *Id.* at 55. The Debtor continues to pay a mortgage on the Bunker Hill property, though he does not rely on the monthly statements mailed to that address when he makes payments. *See id.* at 59.

Several years later, on or around March 7, 2013, Patricia filed a petition with the Surrogate's Court for an order to show cause as to why the Claim should not be allowed, and the Debtor directed to pay the Claim in full. *See* Pl.'s Ex. C. The Surrogate's Court then sent a letter to Patricia and the Debtor, at both the Haddad Road and Bunker Hill addresses, scheduling a settlement conference for June 13, 2013. *See* Pl.'s Ex. D. Both the Debtor and Patricia attended this conference. *See* July 14 Tr. 47. One year later, on or around November 21, 2014, the Surrogate's Court sent a second letter, addressed identically to the first, scheduling another conference for January 8, 2015. *Id.* Neither the Debtor nor Patricia attended this latter conference, however. *See* July 14 Tr. 34, 47. The Debtor asserted that he never received the second letter, and Patricia claimed that she did not know that she had to attend. *Id.*

On April 15, 2015, the Surrogate's Court issued a decision (the "Decision") directing the Debtor to pay Patricia $19,204 in full satisfaction of the Claim. *See* Pl.'s Ex. E. The Decision explains that, after Patricia filed her petition, the Debtor failed to appear at a calendar call on

April 19, 2013, but that he appeared pro se, along with Patricia's counsel, at the settlement

conference in June of 2013, at which time "seemingly fruitful settlement discussions ensued."

*Id.* However, after this point, Patricia's counsel was unable to reach the Debtor, and the letter

scheduling the second conference for January of 2015 "was returned as undeliverable, and there

was no forwarding address." *Id.* The Decision further notes that, "[the Debtor] did not report a

change of address with the [Surrogate's Court], although as a fiduciary, he was obliged to do so."

*Id.* Given the Debtor's failures to appear, the Surrogate's Court imposed, in its words, a "default

judgment," by requiring the Debtor to pay the portion of the Claim "attributable to funeral

expenses." *Id.*

On March 31, 2016, the Decision was reduced to a judgment entered on default in the

amount of $36,137.20 by the New York County Civil Court. *See* Pl.'s Ex. F. The total figure

included the $19,204.00 from the Decision, plus $16,933.20 in interest at 9% from June 16,

2006. *Id.* Patricia served the Civil Court summons and complaint on the Debtor at the Bunker

Hill address. *See* Def.'s Ex. D; July 14 Tr. 19–20, ECF No. 31. The Debtor claimed that he was

unaware of the civil suit until it resulted in the garnishment of his wages. *See* July 14 Tr. 48, ECF

No. 31.

### Discussion

The discharge afforded a chapter 7 debtor under § 727 is qualified by § 523, which

provides for "certain categories of nondischargeable debts that Congress has deemed should

survive bankruptcy." *See In re Nofer*, 514 B.R. 346, 353 (Bankr. E.D.N.Y. 2014) (quoting *In re

DeTrano*, 326 F.3d 319, 322 (2d Cir. 2003)). The category at issue here is found in § 523(a)(4),

which, in relevant part, exempts from discharge any debt arising from "defalcation while acting

in a fiduciary capacity."[3] *Id.* (quoting 11 U.S.C. § 523(a)(4)). A debt may be non-dischargeable under this provision where a plaintiff is able to show "(i) the existence of a fiduciary relationship between the debtor and the objecting creditor, and (ii) a defalcation committed by the debtor in the course of that relationship." *Id.* (quoting *In re Yoshida*, 435 B.R. 102, 108 (Bankr. E.D.N.Y. 2010)); *see also In re Watterson*, 524 B.R. 445, 452 (Bankr. E.D.N.Y. 2015) (articulating the standard as having three elements, including "1) an express [or technical] trust, 2) the debt was caused by fraud or defalcation, and 3) the debtor acted as a fiduciary to the [plaintiff] at the time the debt was created" (quoting *Klingman v. Levinson*, 831 F.2d 1292, 1295 (7th Cir. 1987))); *In re Kern*, 567 B.R. 17, 29 (Bankr. E.D.N.Y. 2017) (same). The plaintiff bears the burden of proving each of these elements by a preponderance of the evidence. *Kern*, 567 B.R. at 29 (quoting *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).

*Fiduciary Relationship*

The first element, the existence of a fiduciary relationship, is ultimately an issue of federal law, though one that may turn on state law principles. *See Watterson*, 524 B.R. at 451. A fiduciary relationship sufficient for § 523(a)(4) "must be pursuant to either an express or technical trust, not to 'constructive or implied trusts.'" *Id.* (quoting *Zohlman v. Zoldan*, 226 B.R. 767, 772 (S.D.N.Y. 1998)). This requirement implicates state law to the extent that it provides for such a qualifying trust. *See Nofer*, 514 B.R. at 354 ("The meaning of 'acting in a fiduciary capacity' implicates state law 'to the extent that [state law] prescribes elements of a trust or regulates fiduciary obligations.'" (quoting *In re Tashlitsky*, 492 B.R. 640, 644 (Bankr. E.D.N.Y.

---

[3] 11 U.S.C. § 523(a)(4) provides in full: "[a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

2013))); *see also Watterson*, 524 B.R. at 451 ("[B]ankruptcy courts may look to state law to determine whether a trust exists.").

Here, Patricia has asserted both that, under New York law, an estate administrator is a fiduciary, and that the Debtor is collaterally estopped from challenging his status as such in light of the Decision. *See* Pl.'s Post-Trial Br., ECF No. 28. The Debtor, for his part, has challenged the application of collateral estoppel, but has not disputed the underlying, more significant point— that he held a fiduciary relationship with respect to Patricia. *See* Def.'s Post-Trial Br., ECF No. 27.

The Decision did indeed note that the Debtor was a "fiduciary" under the New York Surrogate's Court Procedure Act (the "SCPA"). *See* Pl.'s Ex. E. However, regardless of whether this precludes the Debtor from contesting his status as a fiduciary, which he has not done, the SCPA establishes the fiduciary relationship necessary for § 523(a)(4). As other Courts have recognized, the terms of the SCPA establish a technical trust between the administrator of an estate and its beneficiaries and creditors, *see Watterson*, 524 B.R. at 541 (finding that § 1306(3) of the SCPA, which affords voluntary administrators the status and obligations of a duly appointed estate administrator, "establishes a technical trust between a voluntary administrator and a decedent's estate, the beneficiaries and the creditors"), with a *res* that consists of all of the decedent's personal property that the Debtor "received or came into possession of," *id.* at 542. On this basis, both administrators and voluntary administrators alike are treated as fiduciaries, and are "accordingly liable to all persons aggrieved by [their] wrongful actions," including creditors of a decedent's estate. *See* SCPA §§ 708, 1308. The relevant provisions under the SCPA, and in turn the Debtor's fiduciary obligations to his aunt, became applicable when the Debtor was appointed administrator of his father's estate.

*Defalcation*

The next question is whether the Debtor's failure to pay Patricia based on the Claim constituted defalcation while acting in his capacity as a fiduciary. *See Nofer*, 514 B.R. at 353. A showing of "defalcation" requires proof that the relevant conduct involved "a culpable state of mind." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013). On the one hand, this may include a showing of "bad faith, moral turpitude, or other immoral conduct;" on the other, and at a minimum, it requires an "intentional wrong." *Id.* at 273–74. An intentional wrong includes not only "conduct that the fiduciary knows is improper, but also reckless conduct." *Id.* at 274. That is, absent a showing of knowing misconduct, an act may nevertheless constitute defalcation where the fiduciary "'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* (quoting ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985)); *see also In re Cupit*, 514 B.R. 42, 49–50 (Bankr. D. Colo. 2014). Further, a debtor's disregard of that risk must "involve a *gross deviation* from the standard conduct that a law-abiding person would observe in the [debtor's] situation." *Bullock*, 569 U.S. at 274.

This standard, borrowed from the criminal law definition of recklessness, is in part subjective, in that it requires an inquiry into the extent of a debtor's awareness of the risk involved in his actions. *See Cupit*, 514 B.R. at 50. At a minimum, he must be conscious of, but nevertheless disregard, a substantial and unjustifiable risk of that outcome.[4] *See, e.g., Cupit*, 514 B.R. at 50 (noting that criminal recklessness, as described in the Model Penal Code, "involves conscious risk creation"); *People v. Hall*, 999 P.2d 207, 219 (Colo. 2000). While in the criminal

---

[4] It is instructive to compare this to the next, higher level of culpability under the Model Penal Code, "knowingly." *See* Model Penal Code § 2.02(2)(b). While conduct is undertaken "recklessly" when the risk of a certain result is consciously disregarded, the same conduct is undertaken "knowingly" when the individual is "practically certain" that the result will occur. *See Voisine v. United States*, 136 S. Ct. 2272, 2278 (2016).

context the risk is generally of harm to another, here it is the risk that the conduct "will turn out to violate a fiduciary duty." *Bullock*, 569 U.S. at 274.

A critical consideration here is therefore whether, and to what extent, a debtor was *actually aware* of his fiduciary obligations, such that he might have consciously disregarded a risk of violating them. *See Cupit*, 514 B.R. at 51 ("A debtor cannot *consciously* disregard a risk of violating a duty if he or she is wholly unaware of that duty. There must be some evidence that the debtor was aware of the fiduciary duty and of the risk that his conduct would violate that duty."); *see also Watterson*, 524 B.R. at 452; *In re Ward*, 578 B.R. 541, 549 (Bankr. E.D. Va. 2017); *Kern*, 567 B.R. at 29; *In re Kakareko*, 575 B.R. 12, 27–28 (Bankr. E.D.N.Y. 2017). Knowledge of those duties cannot be imputed, nor can they be attributed to a debtor constructively. *See Cupit*, 514 B.R. 51 (citing Jonathan S. Byington, *The Challenges of the New Defalcation Standard*, 88 Am. Bankr. L.J. 3, 31 (2014)). However, a debtor's knowledge may be inferred, should the facts and credible testimony permit it. *See id.*; *Watterson*, 524 B.R. at 453 ("In determining whether the Debtor had the requisite state of mind to meet the defalcation standard the Court looks at the witness's credibility and the evidence presented." (citing *Anderson v. Bessemer, N.C.*, 470 U.S. 564, 575 (1985))).

Moreover, § 523(a)(4) requires that the debt be "for," or arise out of, defalcation such that there is a causal relationship between the act constituting defalcation and the debt in question. *See, e.g.*, *In re Gucciardo*, 577 B.R. 23, 37 (Bankr. E.D.N.Y. 2017) (finding that a debt did not "arise out of" defalcation in a sense sufficient to satisfy § 523(a)(4) where the amount of the debt was greater than the amount of funds misappropriated); *Watterson*, 524 B.R. at 450–54 (finding nondischargeable a debt for a debtor's failure to account for and turn over assets of a decedent's estate where the same conduct constituted defalcation); *Ward*, 578 B.R. at 543–52 (debt for

indemnification owed to provider of surety on bonds for decedent's estate nondischargeable based on debtor's failures to properly administer those estates, which triggered liability); *In re Aiello*, 533 B.R. 489, 492–505 (Bankr. E.D. Pa. 2015) (debt owed to prior estate administrator for self-dealing at expense of estate nondischargeable where the same conduct that gave rise to liability constituted defalcation). In turn, because this is the case, to satisfy § 523(a)(4) the duty recklessly disregarded must be the one that gave rise to the debt.

Once it is determined that a debtor was actually aware of and disregarded the risk of violating a fiduciary duty, the inquiry turns to the nature of the risk itself, and whether it was both "substantial and unjustifiable." *See Bullock*, 569 U.S. at 274. These elements are primarily objective in nature, in that a risk is substantial in light of the likelihood and magnitude of the harm the relevant conduct may cause, and unjustifiable based on the "nature and purpose of the actor's conduct relative to how substantial the risk is." *Cupit*, 514 B.R. at 52 (quoting *Hall*, 999 P.2d at 218). Additionally, based on those determinations, the Court must find that a debtor's conduct grossly deviated from what a "law-abiding" person would have done under the same circumstances. *See Bullock*, 569 U.S. at 274; *see also Cupit*, 514 B.R. at 52. However, to the extent that evaluating these elements turns on the nature and purpose of the Debtor's conduct, as well as his awareness of the circumstances in which he acted, these elements are not exclusively objective, but also require a further analysis of a debtor's subjective state of mind.

Bringing all of that to bear on the instant case, the first hurdle of Patricia's burden was to show that the Debtor had an awareness of his duties with respect to Patricia's Claim and of the risk that his failure to pay the Claim might violate those duties. Patricia has failed to make this showing.

13

As an initial matter, contrary to Patricia's assertions, neither the Debtor's failure to file an accounting and a change of address, or the fact that he used estate assets to purchase the Bunker Hill property, may alone ground a finding of defalcation. Though Patricia established—and, indeed, the Debtor admitted—these facts, a breach of duty, standing on its own, does not constitute defalcation. *See Aiello*, 533 B.R. at 501. More importantly, however, even if the Debtor were aware that these failures likely constituted a breach of his duty, they are not the failures that gave rise to Patricia's debt. Instead, the debt is based solely on her valid claim against Howard's estate, and the Debtor's failure to pay that amount. *See* Pl.'s Ex. E.

Furthermore, these facts do not support the inference that the Debtor disregarded a risk of violating his duties with respect to Patricia's Claim, even when the Debtor's oath is taken into account. The oath references only that the Debtor was required to account for estate assets; it says nothing about his responsibilities with respect to claims, and could not, alone, have afforded him an understanding of the same. *See* Pl.'s Ex. A. While Patricia asserts in her post-trial filings that "the court does not need to impute knowledge [of the Debtor's obligations] as [the Debtor] swore to his understanding of the law," to find that the Debtor had a full understanding of his obligations because he signed the oath would be to do just that—impute knowledge based on his execution of the oath. *See* Post-Trial Rep. Br. 4, ECF No. 30. Swearing to the oath of administration is a part of the petition for letters of administration. *See* SPCA § 708(2). If this permitted a finding that an administrator had full knowledge of all of his fiduciary obligations, then every breach would be an instance of defalcation. This is plainly contrary to not only the logic of the recklessness standard, but also its purpose, which was, at least in part, to help those just like the Debtor here, a "nonprofessional trustee[] administering small family trusts [] immersed in intrafamily arguments." *Bullock*, 569 U.S. at 276. Despite certain inconsistencies in

his account, the Debtor credibly testified that he had a limited understanding of his responsibilities, and his assertion is supported by the various other deficiencies in his administration noted above. Nothing presented by Patricia suggests that the oath itself supplied the Debtor with any additional information about his duties.

None of that is to say, however, that the Debtor had no sense of his obligations. To the contrary, he understood enough to open a bank account for the estate, and to place the proceeds from the sale of his father's co-op into that account. That he understood these responsibilities, however, does not permit the inference that he understood others, and no evidence provided suggests that there is any reason to connect them.

On the precise obligation in question, to pay valid claims against his father's estate, the evidence did demonstrate some understanding. The letter he wrote to Patricia shows an awareness of his responsibility for paying for his father's funeral expenses, and that there was some limit to what he was required to pay. *See* Pl.'s Ex. C. He knew, for instance, that he was not responsible for those expenses attributable to Beulah Larsen. *Id.* However, critically, his letter does not show that he understood any other aspect of handling claims against the estate. To the contrary, that the Debtor objected to Patricia's request by letter suggests that he was unfamiliar with, if not entirely unaware of, the existence of a process for handling claims proscribed by SCPA.[5] *See* SCPA §§ 1801–1814. Without any awareness of this process, he

---

[5] For example, § 1809 of the SCPA affords an administrator a process for preemptively challenging the validity of a claim. It provides:

> Whenever a fiduciary has knowledge or notice that a claim may be asserted and no written notice of claim has been presented to him or if a fiduciary has reason to question the validity of any claim, whether such notice has been presented to him or not, and no action or proceeding to enforce the claim has been instituted, the fiduciary may present a petition to the court showing the facts and praying that the claimant or possible claimant be required to show cause why his claim, if any, should not be disallowed. Similarly, any claimant whose claim is made in compliance with 1803, and whose claim has not been allowed in whole pursuant to 1806 may petition the court showing

could not have understood that his choice to proceed by letter alone might be insufficient to meet his obligations. And, indeed, because the letter offered to pay for the portion of the request that he believed to be valid, it is just as likely that he believed that the letter *was* compliant and consistent with his obligations.

Moreover, nothing that occurred after the letters were exchanged suggests that the Debtor's understanding changed or improved over time. While a considerable amount of testimony was devoted to the Debtor's awareness of proceedings before the Surrogate's Court, including Patricia's petition to allow her claim and the subsequent settlement conferences, nothing said about these events justifies the inference that the Debtor understood their significance with respect to his failure to pay the Claim.

In sum, the evidence presented at trial shows that the Debtor had a basic understanding of his obligations, but not one sufficient to recognize that his conduct risked breaching his duties. To be sure, the Debtor's administration of the estate was deficient in several respects, this one included. He should have been aware that his continued failure to pay any amount of Patricia's request for reimbursement risked breaching his fiduciary obligation. However, that he should have been aware establishes only his negligence; it falls short of showing that he was actually aware of the risk of his deficient conduct, and therefore cannot meet the standard for defalcation set by *Bullock*. *See Cupit*, 514 B.R. at 50. Ultimately, nothing in the record suggests that it is more likely than not that the Debtor understood the process well enough to have disregarded a substantial risk that his failure to pay would be a violation of his obligations.

---

the facts and praying that the fiduciary be required to show cause why the claim should not be allowed.

SCPA § 1809(1).

## Conclusion

For those reasons, the Court finds that Patricia has failed to meet her burden in proving defalcation, and that the debt owed Patricia is therefore not subject to the discharge exception found in § 523(a)(4). A separate judgment will enter.



**Dated: August 16, 2018**
**Brooklyn, New York**

**Nancy Hershey Lord**
**United States Bankruptcy Judge**